**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| REBECCA L. LESTER, individually and as administrator of the Estate of Garry D. Lester, next of kin, and all others similarly situated, | ) ) ) ) | CASE NO.<br><br>JUDGE |
| Plaintiffs, | ) ) ) ) | **CLASS ACTION COMPLAINT FOR PRODUCTS LIABILITY, BREACH OF WARRANTY,** |
| v. | ) ) | **FRAUD, OHIO CONSUMER SALES PRACTICE VIOLATIONS,** |
| ABIOMED, INC.<br>22 Cherry Hill Drive<br>Danvers, MA 01923 | ) ) ) ) | **SURVIVORSHIP, WRONGFUL DEATH, LOSS OF CONSORTIUM** |
| And | ) ) | **JURY DEMAND ENDORSED HEREON** |
| JOHNSON & JOHNSON,<br>d.b.a. Johnson & Johnson MedTech<br>One Johnson & Johnson Plaza<br>New Brunswick, New Jersey 08933 | ) ) ) ) ) | |
| Defendants. | ) | |

Plaintiffs Rebecca L. Lester, individually and as the administrator of the estate of Garry D. Lester, on behalf of herself, the estate, next of kin, and all others similarly situated ("Plaintiff"), by and through her attorneys, files her Class Action Complaint against Defendants Abiomed Inc. ("Abiomed") and Johnson & Johnson ("J & J") (collectively, "Defendants"). Plaintiff alleges as follows:

**INTRODUCTION**

1. This matter concerns the improper manufacture, supply, distribution, marketing of Impella pumps, the deliberate concealment or nondisclosure of after acquired knowledge, and

manipulation of post market regulatory processes intended to ensure the safety of such medical devices.

2.     Impella pumps are intended to be placed in the heart of people to assist the circulation of blood during complicated medical interventions and procedures. Abiomed is the designer of Impella pumps and participates in or causes the manufacturing, marketing, supply, and distribution of these devices.

3.     On December 5, 2016, the FDA granted premarket approval for the Impella CP medical device expanding its indications to include high-risk percutaneous coronary intervention (PCI) and cardiogenic shock.

4.     As early as 2018, Abiomed became aware of defects with their Impella pumps like the Impella CP that caused perforations of the left ventricle during heart procedures including PCI, but continued to participate in or cause the manufacturing, marketing, supply, and distribution of Impella pumps. Abiomed took no steps to comply with FDA post market regulatory process such as initiating a firm recall warning its customers of defects in the product and providing customer with additional instruction for use intended to reduce the likelihood of serious injury or death.  Abiomed continued to act as though the devices were generally safe to be placed into ill or injured individual's hearts.

5.     On May 30, 2021, Decedent, Garry D. Lester died as a direct result of a perforated left ventricle caused by an Impella CP pump.

6.      In October 2021, Abiomed issued a Technical Bulletin to its Field Team sales force. This Technical Bulletin made recommendations for avoiding left ventricle perforations with Impella heart pumps. These new recommendations were not included in, incorporated into,

updated, and correct in the Impella pumps Instructions for Use that were provided to customers when the pumps were sold. (Exhibit B)

7.      Between 2018 and 2022, Abiomed did not initiate a firm recall of the Impella pumps or follow the FDA post market approval regulatory warning requirements. 21 CFR § Part 7, et. seq. (Exhibit C).

8.      The FDA post market approval regulatory warning requirements includes a process for firm-initiated product recalls and corrections. Part of this recall process is notifying customers of deficiencies in products that have the likelihood of causing serious injury or death. 21 CFR § Part 7.46-.48. (Exhibit C).

9.      Between 2018 and 2022, Abiomed received complaints of adverse reactions involving serious injury or death from left ventricle perforations or mispositioned Impella pumps during medical procedures. (Exhibit D and E).

10.      Between 2018 and 2022, Abiomed knew of deficiencies in its Instructions for Use of the Impella pumps but did not follow the FDA regulatory process to recall the product and correct its defective warnings and instructions for use. (Exhibit C).

11.      In December of 2022, J&J acquired Abiomed through a tender offer for $16.6 billion dollars.

12.      After J&J acquired Abiomed, Defendants continued to receive hundreds of reports of serious injury and deaths from customers related to Impella pumps, left ventricle perforations, malpositioned or mispositioned pumps.

13.      J&J and Abiomed, now wholly owned by J&J, were aware of defects with their Impella pumps, continued to manufacture, market, supply, and distribute defective Impella pumps. (Exhibit C, D, E).

14.     On March 1, 2023, the FDA visited Abiomed's corporate offices investigating complaints related to the Impella Pump devices. (Exhibit C).

15.     On September 19, 2023, the FDA issued a Warning Letter to Abiomed Inc. (Exhibit C).

16.     On December 27, 2023, Abiomed initiated a firm recall of certain Impella pumps by sending Urgent Medical Device Correction letters to customers. This letter requested customers to adhere to new and revised warnings:

a.  Carefully position the pump catheter during operative procedures

b.  Use imaging when advancing or torquing the pump catheter.

c.  Use special care when inserting the pump catheter in patients with certain high-risk conditions or during active CPR

d.  Review the updated warnings in the device Instructions for Use

e.  Notify everyone at your facility who needs to be informed of this recall correction.

f.  Notify any other facilities where the products have been forwarded of the updated Instructions for Use (Exhibit E).

17.     On February 9, 2024, the FDA posted a Class 1Device Recall for the identified Impella pump devices. (Exhibit D).

18.     The FDA identified Defendants' firm-initiated recall as a Class 1 recall, the most serious type of recall stating, "Use of these devices may cause serious injuries or death." (Exhibit E).

19.     As of February 9, 2024, Defendants disclosed 129 reports of serious injury and 49 reports of death to the FDA. (Id.)

20.     Since February 9, 2024, Defendants disclosed additional complaints of serious injuries and deaths to the FDA for the time period covering 2018-2024 regarding the recalled Impella pumps.

21.     On September 16, 2024, Plaintiff was informed by a competent medical professional that the Impella CP device used in Decedent's procedure to a reasonable degree of medical probability caused his perforated left ventricle injury and eventual death.

22.     At the time of filing this complaint, Defendants disclosed to the FDA over 1,000 additional reports of serious injuries and over 1,000 additional reports of death which were previously undisclosed covering the period 2018 – 2024.

23.     At the time of filing this complaint, Defendants updated its "Instructions for Use" for Impella pumps in 2024 to incorporate the recommendations and additional warnings intended to reduce the risks of serious injuries and death from use of the recalled Impella pumps.

24.     Only once the FDA became involved with the numerous adulterations and deficiencies with the Impella devices did Defendants engage in the post market approval regulatory process to address device deficiencies based on after acquired knowledge of harmful effects. Had the Defendants taken meaningful action when they became aware of the deficiencies with Impella pumps, years ago, significant injuries and loss of life could have been avoided.

25.      As a direct and proximate result of the defective devices, breach of warranty, fraudulent acts, omissions, and wrongful conduct of Defendants, Garry D. Lester and Class Members were subjected to the risk of, and suffered serious and life-threatening injuries, and/or wrongful death.

## PARTIES

26.     At all relevant times, Plaintiff was a citizen of the State of Ohio, Richland County, and is the duly and properly appointed Administrator of the Estate of Garry D. Lester, appointed by the Probate Court of Richland County, Ohio on June 15, 2022, and Garry D. Lester ("Decedent") was a citizen of the State of Ohio, Richland County, was Plaintiff's husband, and his estate is being administered by Plaintiff. (Ex. 1)

27.      At all relevant times, Abiomed was a manufacturer and distributor of medical devices, incorporated under the laws of the State of Delaware, with its principal place of business in the State of Massachusetts, and doing business in Ohio.

28.     As of December 2022, J&J was the whole owner and parent of Abiomed, incorporated under the laws of the state of New Jersey, with its principal place of business in the State of New Jersey, and doing business in Ohio.

## JURISDICTION AND VENUE

29.     This Court is vested with jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d), because this is a class action in which the total amount in controversy (individually and as a class) exceeds $5,000,000.00.  Jurisdiction is further vested on the basis of diversity because Plaintiff, Rebecca L. Lester, is a citizen of a State different from any Defendant. Plaintiff is a citizen of Ohio, Abiomed is a citizen of Delaware and Massachusetts, and J&J is a citizen of New Jersey. The total amount in controversy with respect to Rebecca L. Lester and the Estate of Garry D. Lester exceeds $5,000,000.00.

30.     This Court is vested with the venue of this action because a substantial portion of the events or omissions giving rise to the claims occurred in this judicial district. Plaintiff resides in Richland County, Ohio. Decedent resided in and was injured and died in Richland County.

31.     This Court has personal jurisdiction over the Defendants because Defendants have transacted and continue to transact business in Ohio, and because Defendants have committed the acts and omissions complained of herein in the State of Ohio.

## UNIVERSAL FACTS

32.     Defendants manufacture(s/d), market(s/ed), and distribute(s/d) several products known as Impella Left Sided Blood Pumps, including Impella 5.0 Blood Pump, Product Number 005062, Impella CP Blood Pump, Product Number 0048-0032, Impella 2.5 Blood Pump, Product Number 005042, Impella CP with Smart Assist Blood Pump, Product Numbers 0048-0024, 0048-0045, 1000080, Impella LD Blood Pump, Product Number 005082, and Impella 5.5 with Smart Assist Blood Pump, Product Numbers 0550-00009 and 1000100 ("Impella pumps").

33.     Impella pumps are Class III Medical Devices, designed to be guided into the ventricle of persons' hearts utilizing arterial catheterization, and are marketed as providing hemodynamic support by assisting pumping functions.

34.     As early as 2018, Abiomed became aware that Impella pumps were perforating the ventricles and of persons' hearts and surrounding great vessels and cardiovascular tissue that the Impella pumps were inserted into.

35.     Soon after the Impella pumps were introduced to market, years before Decedent had the Impella pump inserted, Abiomed began receiving large numbers of adverse event reports (AERs) from health care providers reporting that Impella pumps were causing serious injuries and deaths.

36.     In October of 2021, Abiomed posted on its website a Technical Bulletin, titled "Recommendations for Avoiding Iatrogenic LV Perforation with the Impella Heart Pumps" (Exhibit B, attached). The Technical Bulletin indicated the importance of following Instructions for Use (IFU) for Impella systems and indicated risk of iatrogenic left ventricular perforation, specifically indicating cautions for the Impella CP devices.

37.     The Technical Bulletin was not universally known of. Abiomed did not alert the FDA of the revised guidance in the Technical Bulletin, did not issue a recall, and Defendant did not update the IFUs for Impella Pumps to mitigate risks of ventricular perforation.

38.     J&J wholly acquired Abiomed in December 2022 for $16,600,000,000.00.

39.     During an inspection of Abiomed, Inc. located at 22 Cherry Hill Drive, Danvers, MA on March 1, 2023, through April 13, 2023, the FDA found Abiomed's certain Impella pump devices were adulterated, defectively manufactured and designed, nonconforming, and lacked sufficient warnings.

### 1. Defective Non-Approved Device – Impella Connect System

40.     For example, the Impella Connect System device used in connection with the Impella CP pumps were adulterated because the Connect System was a medical device separate from the Impella CP device and not approved during the pre-market approval process. 21 U.S.C. 351(f)(1)(B).

41.     This Impella Connect System device provided time-critical alarms with patient-specific medical information intended to trigger potential clinical intervention to assure patient safety. The problem with the Connect System was the safety warning software contained multiple bugs that caused the non-approved device to fail at times. (Exhibit C, pages 2-3).

## 2. Nonconforming Manufacturing Defects – Burrs on the Impella CP

42.     The FDA also found the Impella CP devices were adulterated in that the methods used in, or the facilities or controls used for, their manufacture were not in conformity with the good manufacturing practice requirements of the Quality System regulation. 21 CFR Part 820.

43.     The FDA inspection revealed Abiomed previously investigated the Impella CP device for Product Nonconformance with a Major or Critical severity prior to January 1, 2022.

44.     Prior to January 1, 2022, Abiomed's engineers reported finding burrs on the Impella CP AU rotor pump 350 caused from the mold and impeller design. (Exhibit C, page 4).

45.     The same Abiomed engineering study documented "particles that cannot be removed on the surface of the impeller, the inner surface of the component housing is always unacceptable!" (Exhibit C, page 4).

46.     The nonconforming burr defect found on the Impella CP AU rotor pump 350 had a likelihood of causing serious injury and/or death.

47.     The nonconforming burrs on the Impella CP AU rotor pump 350 were assigned Severity Level (major) and Occurrence (extreme) but no correction, removal (voluntary recall), or notification to customers was initiated by Defendants.

48.      Between December 2022 and December 23, 2023, large numbers of serious injuries and deaths from use of Impella pumps, including the Impella CP pump, continued to be reported to Abiomed and J&J by customers after J&J's acquisition of Abiomed.

### 3. <u>Inaccurate Warnings and Instructions for Use</u>

49.     The FDA inspection also found Abiomed and J&J knew of additional warnings and Instructions for Use meant to avoid left ventricle perforations by Impella CP and other Impella pumps during heart procedures which were not in the current Instructions for Use ("IFU"). (Exhibit C, pages 7-8).

50.     The FDA found Abiomed failed to follow required post market approval regulatory requirements and issue a product recall correction or removal report. (Exhibit C, pages 7-8).

51.     The U.S. Food & Drug Administration ("FDA") issued a Warning Letter to Abiomed on September 19, 2023, CMS# 663150. (Exhibit C).

52.      Defendants distributed an Urgent Medical Device Correction letter on December 27, 2023, to customers of Impella pumps, requesting customers to adhere to new and revised warnings including careful positioning of Impella pump catheters, using imaging when advancing or torquing pump catheters, and reviewing updated warnings in the IFUs. (Exhibit D and E).

53.     Defendants issued a recall for Impella devices, specifically the Instructions for Use (IFUs), reportedly initiated on December 27, 2023, and posted February 9, 2024. (Exhibit D and E).

54.      The FDA reported to the public Defendants' recall on March 21, 2024.

55.      There is no indication Defendants ever warned endline consumers of Impella pumps, specifically hospitals, physicians, and patients who would use them, of the additional instructions for use intended to reduce risks and likelihood of serious injuries or death from of ventricular perforation.

56.     Consumers were also not warned or informed of the risk and likelihood of serious injury or death from burrs on the Impella CP impeller AU rotor pump 350 or failure of the Impella Connect safety warning alarm system.

57.     The FDA published "Abiomed Recalls the Instruction for Use for Impella Left Sided Blood Pumps due to Perforation Risks" on March 21, 2024, and further indicated that the "FDA had identified this recall as a Class I recall, the most serious type of recall. *Use of these devices may cause serious injuries or death.*" (Emphasis in original) (Exhibit E).

58.     Defendants intentionally concealed the severity of complications caused by Impella pumps including the Impella CP and the likelihood of health hazards occurring from their use.

59.     Rather than follow regulatory requirements for pre-market approval devices in the Connect System example, or the post market approval regulatory requirements for correcting defective devices based on after acquired knowledge of harmful effects of burrs and insufficient Instructions for Use, Defendants continued to actively and aggressively market Impella pumps as safe, despite their knowledge of numerous reports of cardiac/blood vessel injury and associated serious injuries and deaths of patients.

60.     More, Defendants concealed, and continue to conceal, their knowledge of Impella pumps dangerous propensity to cause serious injury and death. Defendants further concealed their knowledge that Impella pumps design caused these injuries and death.

61.     At the time of the recall initiated by Abiomed and J&J on December 27, 2023, Abiomed's Impella pumps were associated with 129 serious injuries, including 49 deaths.

62.     At the time of filing this complaint, the number of serious injuries and deaths revealed to the FDA by Abiomed and J&J involving Impella pumps between 2018 and 2024

are over 1,000. New previously undisclosed adverse event reports are uploaded to the FDA each month.

63.     With flagrant disregard of the safety of people who may be harmed by their products, Defendants continued to manufacture, market, and distribute or cause to be distributed Impella pump. Defendants knew or should have known the substantial risks of death from heart wall perforation based on Defendants' product and IFUs for said product. Defendants acted for their own profitability and wellbeing while ignoring the tremendous safety risks and deaths that occurred from use of Defendants' Impella pumps.

64.     The conduct of Defendants, as alleged in this Complaint, constitutes willful, wanton, gross, and outrageous corporate conduct that demonstrates a conscious disregard for the safety of Decedent, Plaintiff, and members of the Class. Defendants had actual knowledge of the dangers presented by Impella pumps, yet consciously failed to act reasonably to adequately inform or warn Decedent and members of the class, their physicians, or the public at large, establish and maintain an adequate quality and post-market surveillance system, or recall the system from the market.

65.     In engaging in the negligent and wrongful conduct set forth herein, Defendants demonstrated a conscious disregard for their rights and safety of other persons with great possibility of causing substantial harm. In addition to compensatory damages and other specified damages, Plaintiff accordingly seeks an award of punitive damages in an appropriate amount to be determined by the jury at the time of trial.

## FACTS AS TO NAMED PLAINTIFF

66.     On or about May 27, 2021, Decedent had an Impella CP device placed into his left ventricle (protected PCI). Shortly after placement, Decedent became hypotensive. It was later determined that Decedent's ventricle had been perforated, resulting in several, significant complications that led to Decedent's serious injury and death on May 30, 2021.

67.      On September 16, 2024, Plaintiff was informed by competent medical professional licensed physician that the defective Impella CP pump used in Decedent's procedure most likely caused the left ventricle perforation that led to his death several days later.

68.     Abiomed, directly or through its agents, apparent agents, servants, or employees designed, manufactured, marketed, advertised, distributed, and sold the Impella CP device that was placed into Decedent.

69.     At all relevant times, the Impella pump was utilized and implanted in a manner foreseeable to Abiomed, as Abiomed generated the instructions for use and created procedures for placing the product.

70.     Abiomed failed to ensure their Impella pump which caused Decedent's serious injury and death was not adulterated in any way, was manufactured according to its approved specifications, and contained sufficient Instructions for Use incorporating post market acquired knowledge of harmful effects in a way to avoid heart wall perforation, other injuries, and death.

71.     Abiomed's Impella pump, which caused Decedent's serious injury and death, was out of conformance with pre-market approved specifications and lacked sufficient Instructions for Use.

72.     Abiomed failed to warn users of the Impella CP device and actively marketed the Impella CP device as being safe despite the substantial risk of harm.

73.     Abiomed knew or should have known of the substantial safety risks with the Impella CP device, including that standard use of the device in conformance with Defendant's IFUs could to a reasonable degree of probability cause heart wall perforation, serious injury, and death.

74.     Abiomed advertised, promoted, marketed, sold, and distributed the Impella CP as a safe medical device when Abiomed knew or should have known the Impella CP was not safe for its intended purposes and that the product could cause serious injury and death.

75.     Abiomed had sole access to material facts concerning the defective nature of the Impella CP including but not limited to the adulteration of the Impella CP pump by the Connect System's deficiencies, the burrs on the impellers, insufficient IFU and the Impella CP pump's propensity to cause serious injury and death.

76.     Abiomed avoided providing necessary warnings or recall for their Impella CP device for Abiomed's profitability while ignoring the substantial risk of harm with callous attitude.

77.     In reliance on Abiomed's representations, Decedent's doctors were induced to, and did use, the Impella CP.

78.     At the time of his operation, Plaintiff and Decedent were not informed of, and had no knowledge of, the complaints, known complications, and risks associated with the Impella CP, of which Abiomed sought to conceal.

79.     Plaintiff and Decedent were never informed by Abiomed of the defective and dangerous nature of the Impella CP.

80.     Decedent suffered great pain and suffering, suffered great pain of body and mind, loss of future earnings, a loss of enjoyment of life, mental anguish, and died as a result of Abiomed's defective Impella device.

81.     The plaintiff suffered loss of consortium, great pain of mind, loss of enjoyment of life, and loss of economic earnings, as a result of Abiomed's defective Impella device.

## CLASS ACTION

82.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of all others similarly situated, as representative of the following class (the "Class"):

> All individuals and their respective estates/representatives who, until the date that notice is mailed to the Class, had an Impella Blood Pump inserted into their heart while under the care of a physician in the State of Ohio, and any other state in the United States, and who suffered a ventricular perforation and/or cardiovascular injuries, resulting in serious injury or death between January 1, 2018 and March 21, 2024.

83.     Excluded from the class are any trial judge who may preside over this action, court personnel and their family members, and any juror assigned to this action.

84.     The proposed class definitions are based on the information available to Plaintiff at this time. Plaintiff expressly reserves her rights to modify the class definitions as necessary to account for any newly learned or changed facts as this case progresses.

85.     Plaintiff is a member of the Class which she seeks to represent.

86.     Plaintiff expressly reserves her right to, as necessary, conduct a review of the Defendants' records to ascertain the Class.

87.     **Numerosity**: Plaintiff is informed and believes, and thereon alleges, that there are at minimum hundreds, possibly thousands, of members of the Class described above. The

exact size of the Class and the identities of the individual members are identifiable through Defendant's records.

88.     **Commonality**: This action involves questions of law and fact common to the Class. Such common questions include but are not limited to:

   a.   Whether Impella pumps are defective and unreasonably dangerous, including for the reasons described by the recall of Impella pumps.

   b.   Whether Defendant(s) was/were negligent in its design, testing, manufacturing, assembly, marketing, distribution, and sale of Impella pumps.

   c.   Whether Plaintiff and Class members are entitled to compensatory and/or punitive damages.

   d.   What is the business relationship amongst the Defendants; and

   e.   Whether Defendants conspired and engaged in racketeering when J&J acquired Abiomed and continued to hide defective and unreasonably dangerous Impella pumps.

89.     **Typicality**: Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful, negligent, and likely willful conduct.

90.     **Adequacy of Representation**: Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the members of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class. In addition, Plaintiff has retained counsel who are competent and experienced in the

prosecution of class action litigation and complex product liability litigation. The claims of Plaintiff and the Class Members are substantially identical as explained above.

91.     **Superiority**: This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than separate individual cases for each Class member, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

92.     **Predominance**: Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical product design, manufacturing, packaging, and product distribution business practices, injury causation, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant(s)'s liability and/or claim to damages is common to Plaintiff and each member of the Class. If Defendant breached their duty to Plaintiff and Class members, then Plaintiff and each Class member suffered damages by that conduct.

93.     **Ascertainability**: Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Defendant(s) records.

## <u>COUNT 1 – STRICT PRODUCTS LIABILITY, R.C. § 2307.74</u>

### <u>(Product Defective in Manufacture)</u>

94.     Plaintiff hereby incorporates and adopts by reference each and every allegation set forth above.

95.     Defendants' actions were in violation of Ohio Rev. Code Ann. § 2307.74.

96.     Defendant(s) supplied, manufactured, sold, distributed, and/or otherwise placed into the stream of commerce the Impella CP pump placed into Decedent.

97.     The Impella CP pump manufactured by Defendants and placed into Decedent deviated in material way from design specifications, formula, or performance standards as approved by the FDA.

98.     The Impella CP pump manufactured by Defendants and placed into Decedent had burrs on the AU rotor pump 350 that deviated from the FDA pre-market approved design specifications.

99.     The Impella CP device placed in Decedent was not reasonably safe for its intended use and was defective with respect to its manufacture.

100.     The Impella CP pump was defective in its manufacture when it left control of Defendants in a defective condition, it was not safe for its anticipated use.

101.     The Impella CP pump was unreasonably dangerous to the user or consumer, taking into consideration the utility of said product and the risks involved in its use. The foreseeable risks associated with a device nonconforming with its approved FDA specifications were more dangerous than a reasonably prudent consumer such as Plaintiff and/or Decedent's and/or Class members' physicians would expect when the product was used for its normal and intended purpose.

102.     The Impella CP pump was expected to and did reach the consumer without substantial change in the condition in which it was manufactured and/or otherwise placed into the stream of commerce.

103.     A reasonably prudent medical device manufacturer would have recognized the defective manufacture of the Impella CP pump with burrs on the AU rotor impellers and would not have placed the Impella CP pump with its defective, nonconforming, unapproved manufactured condition into the stream of commerce.

104.     The manufacturing defects in the Impella CP pump were not known, knowable, and/or reasonably apparent to Plaintiff, Decedent, Class members and/or his physician/Class members' Decedent's physicians or discoverable upon any reasonable examination.

105.     The Impella pump was used in the manner in which it was intended to be used and implanted into Decedent pursuant to the instruction for use and the product specifications provided by Defendant(s).

106.     Defendant(s) are strictly liable to the Plaintiff for manufacturing, marketing, labeling, packaging, and selling a defective product.

107.     As a direct and proximate result of the Impella CP pump's aforementioned manufactured defects, Decedent and Class members were caused to suffer severe personal injuries, pain and suffering, severe emotional distress, financial or economic loss, and other damages.

108.     As a direct and proximate result of the Impella CP pump's aforementioned defects, Plaintiff and Class members were caused to suffer serious injury and/or the death of a spouse, loss of consortium, pain and suffering, severe emotional distress, and financial or economic loss.

## COUNT II– STRICT PRODUCTS LIABILITY, R.C. § 2307.75

### (Impella Connect System Device Defective in Design)

109.     Plaintiff hereby incorporates and adopts by reference each and every allegation set forth above.

110.     Defendants' actions were in violation of Ohio Rev. Code Ann. § 2307.75.

111.     Defendant(s) supplied, manufactured, sold, distributed, and/or otherwise placed into the stream of commerce the Impella Connect System.

112.     The Impella Connect System did not have pre-market approval from the FDA.

113.     The Impella Connect System is a remote monitoring device management system that allows clinicians and Impella support staff to remotely view a patient's health status, warn of any dangers, and limit risk to patients' wellbeing while physicians use Impella pumps in patients.

114.     The Impella Connect System worked together with the Impella medical devices including the Impella CP pump placed into Decedent.

115.     The Impella Connect System used during Decedent's procedure was not reasonably safe for its intended use and was defective with respect to its design.

116.     The Impella Connect System was in a defective condition and was defective in its design in that when it left the possession of Defendant(s), it was not safe for its anticipated use and safer, more reasonable alternative designs existed that could have been utilized by Defendant(s).

117.     The Impella Connect System was unreasonably dangerous to the user or consumer, taking into consideration the utility of said product and the risks involved in its

use. The foreseeable risks associated with the design of the product were more dangerous than a reasonably prudent consumer such as Plaintiff and/or Decedent's and/or Class members'/Class members' Decedent's physicians would expect when the product was used for its normal and intended purpose.

118.     The Impella Connect System was expected to and did reach the consumer without substantial change in the condition in which it was supplied, distributed, sold, and/or otherwise placed into the stream of commerce.

119.     A reasonably prudent medical device manufacturer would have recognized the defective design of the Impella Connect System and would not have placed the Impella Connect System with its defective design into the stream of commerce.

120.     The design defects in the Impella Connect System were not known, knowable, and/or reasonably apparent to Plaintiff, Decedent, Class members and/or his physician/Class members physicians or discoverable upon any reasonable examination. The Impella Connect System was used in the manner in which it was intended to be used pursuant to the instruction for use and the product specifications provided by Defendant(s).

121.     Defendant(s) are strictly liable to the Plaintiff for designing, manufacturing, marketing, labeling, packaging, and selling a defective product.

122.     Additionally, at the time the Impella Connect System left Defendant(s)' control, a practical and technically feasible alternative design was available that would have prevented the harm suffered by Plaintiff/Class members.

123.     As a direct and proximate result of the Impella Connect System's aforementioned defects, Decedent and Class members were caused to suffer severe personal injuries, pain and suffering, severe emotional distress, financial or economic loss, and other damages.

124.     As a direct and proximate result of the Impella Connect System's aforementioned defects, Plaintiff and Class members were caused to suffer the death of a spouse, loss of consortium, pain and suffering, severe emotional distress, and financial or economic loss.

## COUNT III – STRICT PRODUCTS LIABILITY, R.C. § 2307.76

### (Product Defective Due to Inadequate Instructions)

125.     Plaintiff hereby incorporates and adopts by reference each and every allegation set forth above.

126.     Defendant(s)' actions were in violation of Ohio Rev. Code Ann. § 2307.76.

127.     Defendant(s) designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the Impella pumps, including the one placed into Decedent and Class members/Class members' Decedents, into the stream of commerce and, in the course of the same, directly advertised and marketed the device to persons responsible for consumers, and therefore had a duty to warn of the risk of harm associated with the use of the device and to provide adequate instructions on the safe and proper use of the device.

128.     At the time Defendant(s) supplied, designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the device into the stream of commerce, the device was defective and presented a substantial danger to users of the product when put to its intended and reasonably anticipated use. Defendant(s) failed to adequately warn of the device's known or reasonably scientifically knowable dangerous propensities and further failed to adequately provide instructions on the safe and proper use of the device.

129.     Defendant(s) knew or should have known at the time they manufactured, labeled, distributed, and sold the Impella pump that was placed into Decedent/Class members/Class members' Decedents that the Impella pump posed a significant and higher risk than other similar devices of device failure and resulting serious injuries and death, such as the injuries

130.     Defendant(s) failed to timely and reasonably warn of material facts regarding the safety and efficacy of the Impella pump and its propensity to cause the injuries and death suffered by Decedent/Class members/Class members' Decedents; no reasonable health care provider or patient would have used the device in the manner directed, had those facts been made known to the prescribing healthcare providers or the consumers of the device.

131.     The warnings, labels, and instructions provided by the Defendant(s) at all times relevant to this action, are and were inaccurate, intentionally misleading, misinformed, and misrepresented the risks and benefits and lack of safety and efficacy associated with the device. (Exhibits B, C, D, E).

132.     The health risks associated with the device as described herein are of such a nature that ordinary consumers would not have readily recognized the potential harm.

133.     The Impella pumps, which were supplied, designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold into the stream of commerce by Defendant(s), were defective due to inadequate warnings, labeling, and/or instructions accompanying the product.

134.     When Decedent/Class members/Class members' Decedents were treated with the Impella pump device(s), Defendant(s) failed to provide adequate instructions for use warning against reasonably foreseeable risks even though they had post market after acquired knowledge of the need to correct the IFU. (Exhibits B, C, D, E).

135.    Defendant(s) deliberately concealed the after acquired knowledge of harmful effects of serious injury and death resulting from insufficient warnings to physicians and patients to: 1) carefully position the pump catheter during operative procedures; 2) use additional imaging devices when advancing or torquing the pump catheter; 3) use special care when inserting the pump catheter in patients with certain high risk conditions. (Exhibit B, C, D, E).

136.    Defendant(s) intentionally failed to disclose to customers after acquired knowledge of harmful effects of using the recalled Impella pump devices without additional instructions for use. Specifically, Decedent and his physician should have been informed of the need to use additional imaging devices during the invasive heart procedure to ensure proper positioning of the Impella CP pump.

137.    Defendants knew absent additional imaging tools to assist in positioning the Impella pumps that serious injury or death was likely to occur as detailed in the Technical Bulletin for its sales team:

> "Awareness of the position of the Impella devices within the LV cavity is critical. With Impella CP, cardiologists engrossed in high-risk PCI procedures should nevertheless monitor pump position and reposition Impella CP if the pigtail has become bent after migrating deeper...Once the Impella CP is placed, capturing that fluoroscopic image allows the operator to be aware if the pump dives deeper." (Exhibit B)

138.    Unfortunately, the above-mentioned market knowledge information and warnings were not included in the IFU sent to customers but used only for Abiomed's Field Team sales department.

139.    Defendant(s) manipulated the FDA post market regulatory process that required Defendants to inform customers of new instructions for use learned from post market

approval adverse event reports gathered from customers.  Defendants knew the burr and insufficient IFU required Defendants to initiate a product recall correction.

140.　　Instead, Defendants failed to follow the regulatory post market procedures and instead attributed adverse events to "operator error" despite knowing the IFU were insufficient and most likely would have lower the risk of serious injury and death.

141.　　The FDA's post market approval after acquired knowledge regulatory requirements are no more than Ohio's legal duties to provide sufficient Instructions for Use. 21 CFR § 7.46-.49.

142.　　Neither Plaintiff, Decedent, Class members, Class members' Decedents', nor their healthcare providers knew of the substantial danger associated with the intended and foreseeable use of the device as described herein.

143.　　Plaintiff, Decedent, Class members, Class members' Decedents, and their health care providers used the Impella pump in a normal, customary, intended, and foreseeable manner.

144.　　Upon information and belief, the defective dangerous condition of the Impella pumps, including the one used on Decedent, Class members, and Class members' Decedents, existed at the time they were manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold by Defendant(s) to distributors and/or healthcare professional organizations.

145.　　Upon information and belief, the Impella pump used on Decedent, Class members, and Class members' Decedents was in the same condition as when it was manufactured, inspected, marketed, labeled, promoted, distributed, and sold by Defendant(s).

146.     As a direct and proximate result of the Defendant(s) lack of sufficient warning and/or instruction, Decedent and Class members were caused to suffer severe personal injuries, pain and suffering, severe emotional distress, financial or economic loss, and other damages.

147.     As a direct and proximate result of the Defendant(s) lack of sufficient warning and/or instruction, Plaintiff and Class members were caused to suffer the death of a spouse, loss of consortium, pain and suffering, severe emotional distress, and financial or economic loss.

## COUNT IV – BREACH OF EXPRESS WARRANTY, R.C. § 2307.77

148.     Plaintiff hereby incorporates and adopts by reference each and every allegation set forth above.

149.     Defendant(s) breaches of warranty were in violation of Ohio Rev. Code Ann. § 2307.77.

150.     Defendant(s) through their officers, directors, agents, representatives, and written literature and packaging, and written and media advertisement, expressly warranted that the Impella pumps were safe and fit for use by consumers, was of merchantable quality, did not produce dangerous side effects, and were adequately assessed and fit for their intended use.

151.     The Impella pumps did not conform to the Defendant(s)' express representations because they were not reasonably safe, were adulterated, were defective in manufacture, had inaccurate warnings and IFU, and caused severe and  injury and death.

152.    Defendants' Impella pumps, including the Impella CP used with Decedent, were adulterated when they used the non-approved Impella Connect System in conjunction with the Impella pumps during procedures.

153.    Defendants' Impella CP pumps, including the pump used with Decedent, were defective contrary to their warranty because they deviated from their approved manufacturing specifications. The deviation from approved manufacturing specifications formed burrs on the impellers.  These burrs adultered the Impella CP device and increased the foreseeable risks of serious injury and death from the deficiencies in breach of the express warranty.

154.    Defendants' Impella CP pumps including the pump used with Decedent, were defective contrary to their warranty because the warnings and IFU provided with the Impella CP and other pumps provided inaccurate or insufficient information learned from post market reports.  The failure to include accurate warnings and IFU based upon post market reports breach the Impella pumps express warranty and increased the foreseeable risks of serious injury and death from the deficiencies in breach of the express warranty.

155.    Defendants had a duty to provide information about the Impella pumps to customers same as required by federal law.  Ohio's product liability laws require no different requirements than those required by the FDA. 21 CFR § 820.100(a)(3); 21 CFR § Part 7 et seq.; 21 CFR § 803.50; 21 CFR § 814.82(a)(9); 21 U.S.C. § 351 et. seq.

156.    Defendant(s) further breached express representations made to Decedent's, Class members, and Class members' Decedents' physicians and healthcare providers with respect to the Impella pump used on Decedent in the following respects:

a. Defendant(s) represented to Decedent's, Class members', and Class members' Decedents' physicians and healthcare providers through labelling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions, among other ways, that the Defendant(s) Impella pumps were safe, meanwhile Defendant(s) fraudulently withheld and concealed information about the substantial risk of serious injury and death associated with using Impella pumps;

b. Defendant(s) represented to Decedent's, Class members', and Class members' Decedents' physicians and healthcare providers that the Defendant(s) Impella pumps were as safe and/or safer than other alternative procedures and devices then on the market, meanwhile Defendant(s) fraudulently concealed information that demonstrated that Impella pumps were not safer than alternative therapies and products available on the market; and

c. Defendant(s) represented to Decedent, Class members, Class members' Decedents', and their physicians and healthcare providers that Defendant(s) Impella pumps were more efficacious than other alternative procedures, therapies, and/or devices. Meanwhile Defendant(s) fraudulently concealed information regarding the true efficacy of Impella pumps.

157. At all relevant times, the Impella pumps did not perform as safely as an ordinary consumer would expect, when used as intended or in a reasonably foreseeable manner.

158. Plaintiff, Decedent, Class members, Class members' Decedents, their physicians, and the medical community reasonably relied upon the Defendant(s) express warranties for the Impella pumps.

159.     Decedent, Class members, and Class members' Decedents were intended consumers of the Impella pump when Defendant(s) made the warranties set forth herein, and such warranties were made to benefit Decedent, Class members, and Class members' Decedents as a patient and consumer.

160.     At all relevant times, the Impella pump was used on Decedent, Class members, and Class members' Decedents by Decedent's, Class members', and Class members' Decedents' physicians for the purpose and in the manner intended by Defendants.

161.     Decedent/Class members/Class members' Decedents and Decedent's/Class members/Class members' Decedent's physicians, by use of reasonable care, could not have discovered the breached warranty and realized the danger.

162.     As a direct and proximate result of the Defendant(s) breach of express warranty, Decedent and Class members were caused to suffer severe personal injuries, pain and suffering, severe emotional distress, financial or economic loss, and other damages.

163.     As a direct and proximate result of the Defendant(s) breach of express warranties, Plaintiff and Class members were caused to suffer the death of a spouse, loss of consortium, pain and suffering, severe emotional distress, and financial or economic loss.

## COUNT V – FRAUDULENT CONCEALMENT

164.     Plaintiff hereby incorporates and adopts by reference each and every allegation set forth above.

165.     Defendant(s) engaged in and fraudulently concealed information with respect to the Impella pumps in the following respects:

   a.  Defendant(s) represented through the labeling, advertising, marketing materials, seminar presentations, publications, notice letters, and regulatory submissions that the Impella pumps were safe and fraudulently withheld and concealed information about the substantial risks of using Impella pumps;

   b.  Defendant(s) represented that using Impella pumps was safer than other alternative procedures and fraudulently concealed information which demonstrated that Impella pumps were not safer than alternatives.

   c.  Defendant(s) concealed that they knew of the Impella pumps dangerous propensity to perforate cardiac/cardiovascular tissue and was causing complications from causes other than the manner in which the treating physician used the device; and

   d.  That the frequency of these problems and the severity of injuries were substantially worse than had been reported.

166.     Defendant(s) had knowledge that the representations they made concerning the Impella pumps were false.

167.    Defendant(s) had sole access to material facts concerning the dangers and unreasonable risks of the Impella pumps.

168.    The concealment of information by Defendant(s) about the risk of Impella pumps was intentional.

169.    The concealment of information and the misrepresentations about the Impella pumps was made by the Defendant(s) with the intention that Decedent's/Class members'/Class members' Decedents' health care providers and Decedent/Class members/Class members' Decedents rely upon them.

170.    Decedent, Class members, Class members' Decedents and their physicians relied upon the representations and were unaware of the substantial risks of the Impella pumps which the Defendant(s) concealed from the public, including Plaintiff, Decedent, Class members, Class members' Decedents, and their physicians.

171.    As a direct and proximate result of the Defendant(s) actions, omissions, and misrepresentations, Decedent and Class members were caused to suffer severe personal injuries, pain and suffering, severe emotional distress, financial or economic loss, and other damages.

172.    As a direct and proximate result of the Defendant(s) action, omissions, and misrepresentations, Plaintiff and Class members were caused to suffer the death of a spouse, loss of consortium, pain and suffering, severe emotional distress, and financial or economic loss.

173.    The Defendant(s) acted with oppression, fraud, and malice towards Plaintiff and Decedent. Therefore, Plaintiff requests the trier of fact, in the exercise of its sound discretion, award additional damages for the sake of example and for the purpose of punishing

Defendant(s) for their conduct, in an amount sufficiently large to be an example to others, and to deter the Defendant(s) and others from engaging in similar conduct in the future.

174.     Had Defendant(s) not concealed this information, neither Decedent, Class members, Class members' Decedents, nor their health care providers would have consented to using the Impella pump.

## COUNT VI – FRAUDULENT MISREPRESENTATION

175.     Plaintiff hereby incorporates and adopts by reference each and every allegation set forth above.

176.     Defendant(s) made false statements and representations to Decedent and his healthcare providers concerning the Impella product used on Decedent.

177.     Defendant(s) fraudulently misrepresented to Decedent's, Class members, and Class members' Decedents' physicians and healthcare providers with respect to the Impella pump used on Decedent in the following respects:

a.   Between 2018 and December 27, 2023, Defendant(s) represented to Decedent's, Class members', and Class members' Decedents' physicians and healthcare providers through labelling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions, among other ways, that the Defendant(s) Impella pumps were safe, meanwhile Defendant(s) fraudulently withheld and concealed information about the substantial risk of serious injury and death associated with using Impella pumps;

b.   Defendant(s) represented to Decedent's, Class members', and Class members' Decedents' physicians and healthcare providers that the Defendant(s) Impella pumps were as safe and/or safer than other alternative procedures and devices

then on the market, meanwhile Defendant(s) fraudulently concealed information that demonstrated that Impella pumps were not safer than alternative therapies and products available on the market; and

    c.    Defendant(s) represented to Decedent, Class members, Class members' Decedents', and their physicians and healthcare providers that Defendant(s) Impella pumps were more efficacious than other alternative procedures, therapies, and/or devices. Meanwhile Defendant(s) fraudulently concealed information regarding the true efficacy of Impella pumps.

178.    At all relevant times, the Impella pumps did not perform as safely as an ordinary consumer would expect, when used as intended or in a reasonably foreseeable manner.

179.    Plaintiff, Decedent, Class members, Class members' Decedents, their physicians, and the medical community reasonably relied upon the Defendant(s) false representations for the Impella pumps.

180.    Decedent, Class members, and Class members' Decedents were intended consumers of the Impella pump when Defendant(s) made the false represenations set forth herein, and such misrepresentations were made to benefit Decedent, Class members, and Class members' Decedents as a patient and consumer.

181.    At all relevant times, the Impella pump were used on Decedent, Class members, and Class members' Decedents by Decedent's, Class members', and Class members' Decedents' physicians for the purpose and in the manner intended by Defendants.

182.    Decedent/Class members/Class members' Decedents and Decedent's/Class members/Class members' Decedent's physicians, by use of reasonable care, could not have discovered the false representations and realized the danger.

183.     As a direct and proximate result of the Defendant(s) fraudulent misrepresentations, Decedent and Class members were caused to suffer severe personal injuries, pain and suffering, severe emotional distress, financial or economic loss, and other damages.

184.     As a direct and proximate result of the Defendant(s) fraudulent misrepresentations, Plaintiff and Class members were caused to suffer the death of a spouse, loss of consortium, pain and suffering, severe emotional distress, and financial or economic loss.

## COUNT VII – OHIO'S CONSUMERS SALES PRACTICES

185.     Plaintiff hereby incorporates and adopts by reference each and every allegation set forth above.

186.     The acts and practices engaged in by Defendant(s) as outlined above constitute unlawful, unfair, and/or fraudulent business practices in violation of the Ohio's Consumer Sales Practices Act, R.C. § 1345.01, *et seq*. (the CSPA)

187.     This included, but was not limited to, representing that the Impella pumps had characteristics or benefits it did not have and/or misrepresenting that the Impella pumps were of a particular standard, namely that it was reasonably safe for use when it was not.

188.     Defendant(s) engaged in unlawful practices, including deception, false promises, misrepresentation, and/or concealment, suppression, or omission of material facts in connection with the sale, distribution, and/or advertisement of the Impella pumps in violation of the CSPA.

189.     Decedent, Class members, and Class members' Decedents purchased the Impella pump, a product that Defendant(s) falsely represented as having certain characteristics and benefits it did not have, *inter alia*, that it was reasonably safe for use, as further set forth above, in violation of the CSPA.

190.     Defendant(s) further knowingly or recklessly engaged in unfair, unconscionable, deceptive, deliberately misleading, false, and/or fraudulent and deceptive acts and practices, all in violation of the CSPAA, and as further described herein, which created a likelihood of confusion or misunderstanding on Decedent's, Class members, and Class member's Decedents' parts with respect to the Impella pump he purchased, including, but not limited to, misrepresenting that the Impella pump was reasonably safe for use and failing to adequately disclose the substantial risk of cardiac/cardiovascular perforation and harm the product entailed given the large number of adverse events Defendant(s) knew or should have been aware of but did not adequately disclose to Decedent, Class members, and Class members' Decedents.

191.     Defendant(s) practices were likely to mislead consumers who acted reasonably to their detriment in purchasing the product based on Defendant(s) representations that it was reasonably safe for use when it in fact was not and had a higher risk of serious injury and death due to its defective design.

192.     Defendant(s) intended for Plaintiff, Decedent, Decedent's physicians, and other consumers to rely on their deceptive practices and representations in order to continue selling and manufacturing Impella pumps.

193.     As a direct and proximate result of the Defendant(s) conduct, Decedent and Class members were caused to suffer severe personal injuries, pain and suffering, severe emotional distress, financial or economic loss, and other damages.

194.     As a direct and proximate result of the Defendant(s) conduct, Plaintiff and Class members were caused to suffer the death of a spouse, loss of consortium, pain and suffering, severe emotional distress, and financial or economic loss.

195.     The Defendant(s) acted with oppression, fraud, and malice towards Plaintiff,] Decedent, Class members, and Class members' Decedents. Therefore, Plaintiff requests the trier of fact, in the exercise of its sound discretion, award additional damages for the sake of example and for the purpose of punishing Defendant(s) for their conduct, in an amount sufficiently large to be an example to others, and to deter the Defendant(s) and others from engaging in similar conduct in the future.

## COUNT VIII – SURVIVORSHIP

196.     Plaintiff hereby incorporates and adopts by reference each and every allegation set forth above.

197.     Plaintiff is the duly appointed Administrator of Decedent's estate, who, with any individual of the Class who are the proper and duly appointed Administrator for estates of decedents who died as a result of Defendant(s) defective Impella pumps, are entitled to survivorship claims.

198.     Survivorship claims are brought on behalf of Plaintiff and members of the Class's decedents claims for which they would have brought had Defendant(s) defective medical device did not cause their death.

199.     Defendant(s) defective Impella pump caused great pain and suffering to both body and mind, loss of enjoyment of life, loss of prospective earning, mental anguish, and death from complications of a perforated heart to decedents.

200.     Plaintiff and the Class are entitled to compensatory, pecuniary, and punitive damages for decedents' pain and suffering, mental anguish, and lost income caused by Defendant(s)' defective manufacture, design, warning, and conformity for Defendant(s) Impella pumps.

## COUNT IX – WRONGFUL DEATH

201.     Plaintiff hereby incorporates and adopts by reference each and every allegation set forth above.

202.     Plaintiff and members of the Class are grieving individuals who have suffered the loss of loved ones caused by Defendant(s) defective manufacture, design, warning, and conformity for Defendant's Impella pumps.

203.     Defendant(s) defective devices which caused the death of decedents deprived decedents the opportunity to live a full and productive life and the opportunity to bond with and/or love decedent's heirs and/or next of kin now and in the future.

204.     By reason of the wrongful death of decedents, caused by Defendant(s) defective device, Plaintiff and members of the class have suffered damages, including but not limited to severe mental anguish, emotional distress, loss of society and companionship, consortium care, assistance, attention, protection, advice, guidance, counsel, instruction, training, education, expanded earning capacity, and services.

205.     Plaintiff and the Class are entitled to compensatory, pecuniary, and punitive

damages for the damages caused by the wrongful death of decedents caused by Defendant's

defective devices.


## COUNT X – LOSS OF CONSORTIUM

206.     Plaintiff hereby incorporates and adopts by reference each and every allegation

set forth above.

207.     Plaintiff(s) injured spouses suffered injuries due to Defendants' defective

products, breach of warranty, and fraudulent acts.

208.     Garry D. Lester's spouse, Plaintiff Rebecca L. Lester, and Garry D. Lester's

children, experienced a loss of consortium including loss of companionship, affection,

support, society, comfort, guidance and counsel because of Defendants' defective

products, breach of warranty, and fraudulent acts.

209.     Plaintiff and the Class are entitled to compensatory, pecuniary, and any other

available damages due to the loss of consortium caused by Defendants.


## PUNITIVE DAMAGES

210.     Plaitiff hereby incorporates and adopts by reference each and every allegation set

forth above.

211.     Plaintiff and Class members are entitled to an award of punitive and exemplary

damages based on Defendants' willful, knowing, fraudulent, malicious acts, omissions,

and conduct, and their complete and total reckless disregard for the public safety and

welfare. Defendants intentionally and fraudulently misrepresented facts and information

to both the healthcare community and the general public, including Plaintiff, Decedent, Class members, Class members' Decedents, and Decedent's and Class member's, and Class members' Decedents' healthcare providers, by making intentionally false and fraudulent misrepresentations about the safety and efficacy of Impella pumps. Defendants intentionally concealed the true facts and information regarding the serious risks of harm associated with use of said product, and intentionally downplayed the type, nature, and extent of the adverse effects of use of the device, despite Defendants' knowledge and awareness of the serious risk of harm and death associated with use of the same. Defendants further intentionally sought to mislead health care providers and patients regarding the risks associated with Impella pumps.

212.    Defendants had knowledge of, and were in possession of evidence, demonstrating that Impella pumps caused significant injuries and death. Defendants continued to market the product by providing false and misleading information with regard to the pump's safety and efficacy to regulatory agencies, the medical community, and consumers of the pumps, notwithstanding Defendants' knowledge of the true and serious risks of harm. Defendants failed to provide accurate information, warnings, and instructions to the healthcare community that would have dissuaded physicians from surgically implanting Impella pumps or from taking proper precautions when utilizing Impell9a pumps and would have kept consumers from agreeing to treatment with Impella pumps, thus depriving physicians and consumers from weighing the true risks against benefits of utilizing Impella pumps.

213.    As a direct and proximate result of the acts described herein, and the use of Impella pumps, Decedent and Class members, and Class members' Decedents were

caused to suffer severe personal injuries, pain and suffering, severe emotional distress, financial or economic loss, and other damages. Moreover, the acts and omissions of Defendants described herein unmistakably showcase their flagrant disregard for the safety of consumers.

214.     As a direct and proximate result of the acts described herein, and the use of Impella pumps, Plaintiff and Class members were caused to suffer the death of a spouse, loss of consortium, pain and suffering, severe emotional distress, and financial or economic loss. Moreover, the acts and omissions of Defendants described herein unmistakably showcase their flagrant disregard for Plaintiff and similarly situated Class members.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff demands a jury trial on all claims, counterclaims, defenses, and other issues so triable, by the maximum number of jurors permitted by law.

## PRAYER

**WHEREFORE**, Plaintiff and Class members prays for judgment against each of the Defendants as follows:

a.  Judgment be entered against all Defendants on all causes of action of this complaint;

b.  Plaintiff and Class members be awarded their full, fair, and complete recovery for all claims and causes of action relevant to this matter;

c. Plaintiff and Class members be awarded general damages according to proof at the time of trial;

d. Plaintiff and Class members be awarded damages, including past, present, and future medical expenses, according to proof, at the time of trial;

e. Plaintiff and Class members be awarded actual damages, attorneys' fees, and costs, in connection with claims under the CSPA;

f. Plaintiff and Class members be awarded punitive damages according to proof at time of trial;

g. Plaintiff and Class members be awarded pre-judgment and post-judgment interest;

h. Plaintiff and Class members be awarded the costs and expenses of this litigation; and

i. Plaintiff and Class members be awarded such other and further relief as the Court may deem just and proper.

Respectfully submitted,


s/Jonathan A. Good, Esq.
JONATHAN A. GOOD (0065649)
WESTON HURD LLP
1300 E.9th St., Suite 1400
Cleveland, OH 44114
jgood@westonhurd.com
Telephone: (216) 241-6602
Facsimile: (216) 621-8369